# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| BARBARA REYNOLDS BURGER, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>vs.<br><br>HEALTHCARE MANAGEMENT SOLUTIONS, LLC, AND ASRC FEDERAL DATA SOLUTIONS, LLC,<br><br>                              Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br>JURY TRIAL DEMANDED |

Plaintiff Barbara Reynolds Burger ("Plaintiff") brings this Class Action Complaint ("Complaint"), by and through the undersigned counsel, individually and on behalf of all others similarly situated ("Class Members"), against Health Care Management Solutions, LLC ("HMS") and ASRC Federal Data Solutions, LLC ("ASRC Federal"), collectively ("Defendants"), alleging as follows, based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

## I.      INTRODUCTION

1.      Plaintiff brings this class action against HMS and ASRC Federal for their failure to secure and safeguard her and approximately 254,000[1] other individuals' personally identifying information ("PII")[2] and personal health information ("PHI"),[3] including, without limitation,

---

[1] According to a CMS press release, "[i]nitial information indicates that HMS acted in violation of its obligations to CMS," resulting in the potential exposure of the personal information of approximately 254,000 Medicare beneficiaries. However, and upon information and belief, the actual number of Medicare beneficiaries whose personal data was breached substantially exceeds 254,000.

[2] Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R § 200.79.

[3] Personal health information ("PHI") generally encompasses individually identifiable health information that is transmitted or maintained in any form or medium (electronic, oral, or paper) by a covered entity or its business

4871-6041-1746, v. 1

names, addresses, dates of birth, phone numbers, Social Security numbers, Medicare information, including Medicare Beneficiary Identifier numbers, Medicare Entitlement, Enrollment, and Premium Information, and Banking information, including routing and account numbers.

2.      ASRC Federal provides services to federal health agencies, including the Centers for Medicare & Medicaid Services ("CMS"), to modernize legacy systems, improve the security and integrity of health data, implement health data exchange and interoperability solutions, and integrate systems between federal agencies and private sector providers.[4] ASRC Federal is a contractor for CMS, a federal agency within the U.S. Department of Health and Human Services ("DHHS").

3.      HMS offers management consulting, clinical data validity and reliability testing, software development, data collection, analysis, reporting, model application, feasibility studies, and project management solutions.[5] HMS is a subcontractor to ASRC Federal for CMS, handling CMS data as part of processing Medicare eligibility and entitlement records, in addition to premium payments.[6] HMS comes into the possession of, and maintains extensive files containing, the PII and PHI of Medicare beneficiaries.

4.      On December 16, 2022, CMS notified individuals via postal letters that their PII and PHI stored on HMS's corporate network had been exposed in a ransomware attack (the "Data Breach").[7] As a direct and proximate result of Defendants' failure to implement and follow basic security procedures, Plaintiff's and Class Members' most sensitive and confidential PII and PHI are now in the hands of cybercriminals.

---

associates, excluding certain educational and employment records. Health Insurance Portability and Accountability Act of 1996 ("HIPAA").
[4] https://www.asrcfederal.com/markets/health/
[5] https://www.bloomberg.com/profile/company/8205628Z:US?leadSource=uverify%20wall
[6] Letter from CMS to Medicare enrollees potentially affected by the data breach (December 16, 2022). Plaintiff's letter attached hereto as Exhibit 1.
[7] *Id.*

4871-6041-1746, v. 1

5.      Plaintiff and Class Members now face a significantly increased and certainly impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their data.

6.      Plaintiff, on behalf of herself and all others similarly situated, alleges claims for negligence, negligence *per se*, breach of implied contract or alternatively unjust enrichment, breach of fiduciary duty, and declaratory judgment. Plaintiff, on behalf of herself and the Class, seeks: (i) actual damages, economic damages, statutory damages, and/or nominal damages; (ii) punitive damages; (iii) fees and costs of litigation; and (iv) injunctive relief, including (but not limited to) the adoption of reasonably sufficient practices to safeguard PII and PHI in Defendants' custody in order to prevent incidents like the Data Breach from recurring in the future, and for Defendants to provide identity theft protection services to Plaintiff and Class Members for their lifetimes.

## II.     PARTIES

7.      Plaintiff is a citizen and resident of the City of Cleveland, Bradley County, State of Tennessee. Plaintiff is a Medicare beneficiary. She entrusted Defendants with her sensitive and confidential PII and PHI.

8.      Shortly after CMS posted the December 16, 2022 Data Breach notification letters, Plaintiff received the notice that her PII and PHI were impacted by the Data Breach.  As a result of the Data Breach, Plaintiff and her husband received new Medicare cards. As a result of the Data Breach and since January 2023, Plaintiff has been the victim of bank fraud. On or about January 23, 2023, unauthorized purchases started being made with her credit card, which is tied to the bank account that HMS/ASRC Federal would have used to process Plaintiff's Medicare payments. To

date, more than a dozen unauthorized credit card purchases have been made with Plaintiff's credit card.

9.      Additionally and in recent weeks, Plaintiff and her husband each have received phishing e-mail scams claiming to be from Plaintiff's bank above-mentioned.

10.      Since the Data Breach, Plaintiff has also received an extreme increase in the amount of spam calls to her phone number.

11.      Defendant ASRC Federal is the government services subsidiary of Arctic Slope Regional Corporation. Arctic Slope Regional Corporation is a private, for-profit, Alaska Native Corporation with headquarters in Utqiaġvik, Alaska, that "provides services to federal health agencies, including the CMS, to modernize legacy systems, improve the security and integrity of health data, as well as implementing health data exchange and interoperability solutions, integrating systems between federal agencies and private sector providers."[8]

12.      ASRC Federal was incorporated in March 2014 and has headquarters based in Beltsville, Maryland.

13.      According to various online sources, ASRC Federal's estimated revenue is between hundreds of millions to upwards of $5 billion.[9]

14.      ASRC Federal supports CMS's Office of Hearings and Inquiries.[10] The contract services ASRC Federal provides to CMS as a business associate include resolving system errors related to Medicare beneficiary entitlement and premium payment records, as well as collecting Medicare premiums from the direct-paying beneficiary population.

---

[8] https://www.asrcfederal.com/markets/health/

[9] *See*, *e.g.*, https://www.zippia.com/asrc-federal-careers-15542/revenue/; https://www.zoominfo.com/c/asrc-federal-holding-co/351218584;https://growjo.com/company/ASRC_Federal; and https://www.owler.com/company/asrcfederal.

[10] Letter from Congress to the Centers for Medicare & Medicaid Services administrator, Chiquita Brooks-LaSure. Attached hereto as Exhibit 2.

15.     Defendant HMS is a West Virginia-based corporation, with an office in Maryland. As a subcontractor to ASRC Federal, HMS handles CMS' data as part of processing Medicare eligibility and entitlement records, in addition to premium payments.

16.     ASRC Federal obtained a contract to handle the above-mentioned tasks with DHHS, particularly as it relates to CMS. ASRC Federal then subcontracted to HMS to handle all or a part of the contract at issue. ASRC Federal is responsible for the actions of its subcontractors, including HMS, under its contract with CMS, and based on the doctrines of *respondeat superior* and joint and several liability. ASRC Federal had an obligation to ensure that HMS abided by its duties to protect the Plaintiff's and Class Members' data, and ASRC Federal is equally liable for the misconduct, failures, and breaches of the law by HMS.

## III.    JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because this is a class action wherein there are more than 100 members of the Class, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one member of the Class, as defined below, is a citizen of a state different than Defendants to establish minimal diversity, as Plaintiff is a citizen of the State of Tennessee and Defendants are citizens of the State of Maryland for jurisdiction purposes.

18.     This Court has personal jurisdiction over Defendant ASRC Federal pursuant to 28 U.S.C. § 1332(c)(1) because it is headquartered in Maryland, the state of its incorporation.

19.     This Court has personal jurisdiction over Defendant HMS pursuant to 28 U.S.C. § 1332(c)(1) because it has an office in Maryland. *See Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

4871-6041-1746, v. 1

## IV.   FACTUAL ALLEGATIONS

### A.  THE DATA BREACH

20.     On October 8, 2022, HMS experienced a data breach in the form of a ransomware attack.[11] On October 9, 2022, CMS was notified that HMS' systems had been subject to a cybersecurity incident. On October 18, 2022, CMS determined the incident potentially included PII and PHI for Medicare enrollees.

21.     On November 14, 2022, HMS reported the Data Breach that affected up to **500,000** individuals to the DHHS' Office for Civil Rights.[12] However, in a press release published on its website on December 14, 2022, CMS claims that the Data Breach had the potential to impact up to 254,000 Medicare beneficiaries' personally identifiable information.[13]

22.     According to Congress, it was not until December 1, 2022, that CMS made the determination that the Data Breach constituted a "major incident," as defined in the Federal Information Security Modernization Act of 2014 (FISMA),[14] triggering a legal obligation to inform Congress of such cybersecurity incidents.[15]

23.     Pursuant to Congressman Comer and Congresswoman McMorris Rodgers' letter to CMS dated March 20, 2023, "bad actors had access to Medicare beneficiaries' information for **two**

---

[11] Notably, this is not the first data breach involving CMS beneficiary data. In 2018, attackers "used the front door," and forty-five portal accounts, created sometime between May and October 2018, were discovered to be conducting millions of searches in order to pull information from the database. The activity was not initially tagged as unusual because the system allowed unlimited database searches per account. *See* https://cyberscoop.com/cms-breach-legitimate-accounts.

[12]       https://www.hipaajournal.com/up-to-254000-medicare-beneficiaries-affected-by-ransomware-attack-on-cms-subcontractor (emphasis added).

[13] CMS.gov press release, *CMS Responding to Data Breach at Subcontractor* (Dec. 14, 2022), *available at* https://www.cms.gov/newsroom/press-releases/cms-responding-data-breach-subcontractor.

[14] 44 U.S.C. § 3541, *et seq.*

[15] Letter from CMS Administrator Chiquita Brooks-LaSure (Dec. 8, 2022), *on file with committee staff.*

**months before** CMS determined this ransomware attack was a 'major incident' triggering a legal obligation to inform Congress of such an incident."[16]

24.     On December 15, 2022, CMS provided Congressional staff with a briefing on the Data Breach. Following that briefing, the Committee on Oversight and Accountability and the Committee on Energy and Commerce opened an investigation, and on March 20, 2023, Congress requested additional documents and communications from CMS to assist in its investigation into "this major incident."

25.     On December 16, 2022, CMS mailed postal letters to Medicare enrollees who were affected, stating that the information compromised in the Data Breach included the following:

      a.    Name
      b.    Address
      c.    Date of Birth
      d.    Phone Number
      e.    Social Security Number
      f.    Medicare Beneficiary Identifier
      g.    Banking information, including routing and account numbers
      h.    Medicare Entitlement, Enrollment, and Premium Information

26.     Additionally, the December 16, 2022 letter indicated that recipients would be issued new Medicare cards.

27.     CMS also recommended that recipients contact their banking institutions and "let them know your banking information may have been compromised."

28.     Further, CMS instructed on how to enroll in a free Equifax Complete Premier credit monitoring service; however, the enrollment deadline was March 31, 2023.[17]

29.     Finally, CMS apologized for the incident, which in no way limits the liability of HMS and ASRC Federal for failing to protect hundreds of thousands of elderly Americans'

---

[16]     https://d1dth6e84htgma.cloudfront.net/CMS_Data_Breach_Letter_FINAL_f1fb700429.pdf?updated_at=2023-03-20T15:21:59.023Z (emphasis added).

[17] Plaintiff attempted to enroll in the credit monitoring service; however, her enrollment number had expired.

4871-6041-1746, v. 1

extremely confidential and sensitive data. Indeed, CMS even acknowledged in the December 16, 2022 letter that "**HMS acted in violation of its obligations to CMS.**" (emphasis added).

30.     The Data Breach allowed the most sensitive and confidential PII and PHI, including banking account numbers and social security numbers, to end up in the hands of bad actors. This poses a clear, present, and existential danger to the Plaintiff and the Class Members.

## B. THE VALUE OF PERSONALLY IDENTIFIABLE INFORMATION (PII) AND PROTECTED HEALTH INFORMATION (PHI)

31.     PII is very valuable to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[18]

32.     Healthcare data is valuable on the black market because it often contains all of an individual's PII (as well as PHI), as opposed to a single piece of information that may be found in some financial breaches.

33.     According to Imprivata, a healthcare data record may be valued several times more on the black market than the next highest value record.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20]

34.     Data breaches involving PII and PHI, like the one at hand, amplify the risks considerably because of the broad range of data that PII and PHI provide criminals with.

35.     Social Security numbers are among the most sensitive kinds of personal information and, when stolen, may be put to a variety of fraudulent uses. The Social Security Administration

---

[18] *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on- the-dark-web- how-much-it-costs
[19] *Hackers, Breaches, and the Value of Healthcare Data,* IMPRIVATA (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

4871-6041-1746, v. 1

stresses that the loss of an individual's Social Security number, as in the case here, can lead to

identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get
> other personal information about you. Identity thieves can use your
> number and your good credit to apply for more credit in your name. Then,
> they use the credit cards and don't pay the bills, it damages your credit.
> You may not find out that someone is using your number until you're
> turned down for credit, or you begin to get calls from unknown creditors
> demanding payment for items you never bought. Someone illegally using
> your Social Security number and assuming your identity can cause a lot of
> problems.[21]

36.    Additionally, changing or canceling a stolen Social Security number is no easy task.

37.    An individual cannot obtain a new Social Security number without significant

paperwork and evidence of misuse. An individual cannot prevent potential misuse of a Social

Security number by simply changing their number. Instead, the individual must show evidence of

actual, ongoing fraud to obtain a new Social Security number.

38.    Even then, obtaining a new Social Security number may not work. According to the

Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very

quickly to the old number, so all of that old bad information is quickly inherited into the new Social

Security number."[22]

39.    Unsurprisingly then, consumers place a high value on the privacy of that data, as

they should. Researchers shed light on how much consumers value their data privacy—and the

amount is considerable. Indeed, studies confirm that "when privacy information is made more

---

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-  personal-  information-is-selling-for-on-the-dark-web/
[21] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/pubs/EN-05-10064.pdf.
[22] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015.), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-  hackers-has-millions-  worrying-about-identity-theft

salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

40. The information compromised in the Data Breach is significantly more valuable than the loss of, for example, payment card information in a retailer data breach because, in that situation, victims can cancel or close payment card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, birthdate, and Social Security number.

41. This data commands a much higher price on the black market. "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

42. All-inclusive health insurance dossiers (also called "fullz") containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[25] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[26]

43. Identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police, among other forms of fraud.

---

[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.
[24] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-   data-stolen-sells-for-10x-   price-of-stolen-credit-card-numbers.html.
[25] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-   credentialsfetch-   high-prices-in-the-online-black-market.
[26] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), https://www.illuminweb.com/wp-   content/uploads/ill-mo-uploads/103/2418/health-systemscyber-   intrusions.pdf.

10

44.     Criminals can use stolen PII and PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[27] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[28]

45.     Hackers took the PII and PHI of Plaintiff and Class Members to engage in identity theft and/or to sell it to other criminals who will purchase the PII and PHI for that purpose. Although Plaintiff and class members are feeling the effects of the Breach now, the full extent of the fraudulent activities resulting from the Data Breach may not come to light for years.

46.     Theft of PII and PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII and PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[29]

47.     Identity theft, which costs Americans billions of dollars annually, occurs when an individual's PII is used without consent to commit fraud or other crimes. Victims of identity theft typically lose hundreds of hours dealing with the crime and hundreds, if not thousands, of dollars.

48.     According to Javelin Strategy & Research, in 2018 alone, identity theft affected over 16.7 million individuals, causing a loss of over $16.8 billion.

49.     According to the FTC, identity theft is serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing

---

[27] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen- healthcaredata- perfcon ("What Happens to Stolen Healthcare Data") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[28] *Id.*

[29] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO.

4871-6041-1746, v. 1

damage to their good name and credit record. Some consumers victimized by identity theft may lose job opportunities or be denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

50.     Identity thieves use personal information for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[30] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court action.[31]

51.     With access to an individual's PII and PHI, criminals can do more than just empty a victim's bank account. They can also commit all manner of fraud, including: (i) obtaining a driver's license or official identification card in the victim's name but with the thief's picture; (ii) using the victim's name and Social Security Number to obtain government benefits; or (iii) filing a fraudulent tax return using the victim's information. In addition, identity thieves may even give the victim's personal information to police during an arrest.[32]

---

[30] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[31] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what- canidentity- thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Mar. 21, 2022).

[32] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Mar. 21, 2023); *See* Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RES.

4871-6041-1746, v. 1

52.     Consumers place a high value not only on their personal information, but also on the privacy of that data. They do so because identity theft causes "significant negative financial impact on victims" in addition to severe distress and other strong emotional and physical reactions.

53.     The United States Government Accountability Office ("GAO") explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name."[33] The GAO Report notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

54.     Further, as noted, there is the likelihood of a lapse in time between when the harm occurs to a victim of identity theft and when that harm is discovered, as well as a lapse between when the PII and PHI are stolen and when it is actually used. According to the GAO, which conducted a study regarding the growing number of data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[34]

55.     Plaintiff and Class Members face a lifetime of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damage in addition to any fraudulent use of their PII and PHI.

### C.   ENTITIES HOLDING PII AND PHI ARE REGULARLY TARGETED

56.     At all relevant times, Defendants knew, or should have known, that the PII and PHI it collected were a target for malicious actors. Defendants knew this, given the unique type and the

---

[33] *See In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018).

4871-6041-1746, v. 1

significant volume of data on their network, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the unencrypted data would harm.

57.     Data thieves regularly target companies like Defendants due to their large volumes of PII and PHI.

58.     As custodians of Plaintiff's and Class Members' PII and PHI, Defendants knew or should have known the importance of protecting their PII and PHI, and of the foreseeable consequences if any data breaches occurred.

59.     Defendants' security obligations were especially important due to the substantial uptick of cyberattacks and data breaches in recent years.

60.     Furthermore, Defendants should have been vigilant in protecting their data because the data that the Defendants held are especially targeted for cyberattacks.

61.     For several years, there has been a year-over-year trend of increased cyberattacks against healthcare-related entities.[35]

62.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found 956 medical data breaches in 2022 with over 59 million patient records exposed.[36] These breaches were a significant increase from the 758 medical data breaches Protenus compiled in 2020, which exposed approximately 40 million records.[37]

63.     With the increase in such attacks, Defendants knew or should have known that they were at high risk of cyberattack and should have taken additional precautions.

---

[34] *See* GAO Report, at p.29.

[35] *2022 Healthcare Data Breach Report*, The HIPAA Journal, January 24, 2023, https://www.hipaajournal.com/2022-healthcare-data-breach-report/.

[36] *See* PROTENUS, *2023 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/breachbarometer- report (last accessed Mar. 21, 2023).

14

64.     Furthermore, Defendants already knew that data privacy was a security issue, as this was at least the second data breach incident involving CMS.

65.     Accordingly, Defendants were aware of the data security risk and should have maintained stronger cybersecurity procedures to prevent an incident like this.

### D.  DEFENDANTS VIOLATED FEDERAL AND STATE LAW

66.     Defendants had a legal duty to protect the data in their possession and prevent third-party actors from illegally accessing it, as required by: (1) federal regulations and state law, including but not limited to HIPAA; (2) industry standards; and (3) agreements with the affected parties such as Plaintiff, whether express or implied, regarding the safety and protection of the PII and PHI.

67.     HIPAA was enacted to improve the Medicare and Medicaid programs, the efficiency and effectiveness of the healthcare system, to encourage the development of a health information system, and establish a set of standards and requirements for the transmission of certain health information, as a corporate entity that transmits any health information in electronic form in connection with a transaction covered by HIPAA, is considered a "Business Associate." *See* 45 CFR § 160.103(3).

68.     Upon information and belief, Defendants are each a Business Associate as defined by HIPAA.[38]

69.     HIPAA requires Business Associates, such as Defendants, to:

(1)     Ensure the confidentiality, integrity, and availability of all electronic protected health information the entity creates, receives, maintains, or transmits;

(2)     Protect against any reasonably anticipated threats or hazards to the security or integrity of such information; and

---

[37] *See Id.*
[38] https://www.zolldata.com/business-associate-addendum.

15

(3)     Protect against any reasonably anticipated uses or disclosures of such information that are not permitted or required under HIPAA.

*See* 45 CFR § 164.306, *et seq.*

70.     HIPAA specifically requires Business Associates to provide administrative, physical, and technical safeguards to secure the PII and PHI. *See* 45 CFR § 164.306 (security standards and general rules); 45 CFR § 164.308 (administrative safeguards); 45 CFR § 164.310 (physical safeguards); 45 CFR § 164.312 (technical safeguards).

71.     The Data Breach resulted from a combination of failures, showing Defendants failed to properly maintain their security as required by HIPAA.

72.     Defendants' failures include, but are not limited to:

a.     Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 CFR § 164.306(a)(1);

b.     Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 CFR § 164.306(a)(2);

c.     Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR § 164.306(a)(3);

d.     Failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 CFR § 164.306(a)(4);

e.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR §164.312(a)(1);

f.     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR § 164.308(a)(1);

g.     Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful

16

effects of security incidents that are known to the entity in violation of 45 CFR § 164.308(a)(6)(ii);

h.   Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain the security of PHI in violation of 45 CFR § 164.530(b) and 45 CFR § 164.308(a)(5); and

i.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 CFR § 164.530(c).

73.   Additionally, the FTC is empowered to protect consumers through the FTC Act (the "FTCA"). According to the FTCA, Section 5, the FTC prohibits "unfair or deceptive acts or practices in or affecting commerce."

74.   An act or practice is unfair where it: (i) causes or is likely to cause substantial injury to consumers; (ii) cannot be reasonably avoided by consumers; and (iii) is not outweighed by countervailing benefits to consumers or to competition. The FTC treats the failure to protect consumer data as an unfair act or practice prohibited by Section 5(a).

75.   On September 15, 2021, the FTC released an official Policy Statement to offer guidance on the scope of its Health Breach Notification Rule, 16 C.F.R. Part 318, which requires that even entities not covered by HIPAA face accountability when consumers' sensitive health information is compromised through data breaches. Notably, the rule was issued more than a decade ago.[39]

76.   Under that rule, entities not covered by HIPAA must notify consumers, the government, and the media when data breaches occur. *See* 16 CFR § 318.1, *et seq.*

---

[39] *Statement of The Commission*, FEDERAL TRADE COMMISSION (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

77.     The FTC also has released numerous guidelines regarding data breaches and how to respond when they occur.[40]

78.     Defendants thus knew or should have known that their data security was inadequate, and that data breaches were likely to occur.

### E. COMMON INJURIES SUSTAINED BY PLAINTIFF AND THE OTHER CLASS MEMBERS

79.     Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII and PHI which remains in Defendants' possession; (vi) future costs of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII and PHI compromised as a result of the Data Breach; and (vii) overpayment for the products and services that were received without adequate data security.

80.     Although CMS has offered identity monitoring services for a limited time, the offered services are inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the highly sensitive nature of the PII and PHI at issue here.

81.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures to protect the PII and PHI of Defendants' current and former customers.

---

[40] https://www.ftc.gov/business-guidance/privacy-security/health-privacy.

4871-6041-1746, v. 1

82.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members are presently experiencing and will continue experiencing actual harm from fraud and identity theft.

83.     Plaintiff and Class Members are presently experiencing substantial risk of out-of-pocket fraud losses, such as loans opened in their names, tax return fraud, utility bills opened in their names, and similar identity theft.

84.     Plaintiff and Class Members are already feeling the effects of the Breach and face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII and PHI. Potential fraudsters could use that information to effectively target such schemes at Plaintiff and Class Members.

85.     Plaintiff and Class Members are also incurring and may continue incurring out-of-pocket costs for protective measures such as credit monitoring fees (for any credit monitoring obtained in addition to or in lieu of the inadequate monitoring offered by CMS), credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

86.     Plaintiff and Class Members also suffered a loss of value of their PII and PHI when cyberthieves acquired them in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

87.     Plaintiff and Class Members have suffered actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

> a.     Finding fraudulent loans, insurance claims, tax returns, and/or government benefit claims;
>
> b.     Purchasing credit monitoring and identity theft prevention;

    c.       Placing "freezes" and "alerts" with credit reporting agencies;

    d.       Spending time with financial institutions or government agencies to dispute fraudulent charges and/or claims;

    e.       Contacting financial institutions and closing or modifying financial accounts; and

    f.       Closely reviewing and monitoring Social Security numbers, bank accounts, payment card statements, and credit reports for unauthorized activity for years to come.

88.    Moreover, Plaintiff and Class Members have an interest in ensuring that their PII and PHI, which is believed to remain in the possession of Defendants, are protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing sensitive and confidential personal, and/or financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

89.    Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII and PHI may be disclosed to the entire world, thereby subjecting them to potential embarrassment and depriving them of their right to privacy.

90.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and face a substantial and present risk of harm.

## V.    <u>CLASS ACTION ALLEGATIONS</u>

91.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and the Class defined as follows:

**ALL PERSONS WHO HAD THEIR PII OR PHI ACCESSED IN THE OCTOBER 8, 2022 CENTERS FOR MEDICARE & MEDICAID SERVICES DATA BREACH**

92.    The following are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents,

successors, predecessors, and any entity in which the Defendants or their parents have controlling interests and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

93.    **Numerosity:** The members in the Class are so numerous that joinder of each of the Class Members in a single proceeding would be impracticable. Defendants reported that approximately 254,000 to 500,000, if not more, Medicare beneficiaries' information was exposed in the Data Breach.

94.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, in that Plaintiff and Class Members sustained damages arising out of the same action or inaction of Defendants relating to their failure to adequately protect, oversee, monitor, and safeguard the PII and PHI of Plaintiff and all other Class Members.

95.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff's claims are made in a representative capacity on behalf of the other members of the Class. Plaintiff has no interests antagonistic to the interests of the other members of the Class and is subject to no unique defenses. Plaintiff has retained competent counsel to prosecute the case on behalf of Plaintiff and the Class. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so.

96.    **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure

4871-6041-1746, v. 1

compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect all Class Members uniformly, and Plaintiff's challenge to those practices hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

97.    **Commonality and Predominance**: Questions of law and fact are common to the claims of Plaintiff and Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not necessarily limited to the following:

    a.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII and PHI from unauthorized access and disclosure;

    b.    Whether Defendants had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

    c.    Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII and PHI;

    d.    Whether an implied contract existed between Class Members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Plaintiff's and Class Members' PII and PHI from unauthorized access and disclosure;

e.      Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

f.      Whether Defendants breached their duties to protect Plaintiff's and Class Members' PII and PHI; and

g.      Whether Plaintiff and Class Members are entitled to damages and the measure of such damages and relief.

98.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

99.     **Superiority:** This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable. The damages suffered by individual members of the Class will likely be relatively small in comparison to the burden and expense of individual prosecutions of litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties and the court systems of many states and federal districts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

## VI.   CAUSES OF ACTION

### COUNT I
### Negligence

100.    Plaintiff incorporates paragraphs 1-98 as if fully set forth herein.

101.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding, securing, and protecting the PII and PHI in their possession, custody, or control.

102.    Defendants owed a duty to Plaintiff and the Class to properly train, vet, and oversee employees and vendors who maintain, access, store, and manage Plaintiff's and Class Members' PII and PHI, and to implement and maintain reasonable data security practices to protect the PII and PHI from foreseeable cyberattacks and unauthorized access.

103.     Defendants also owed a duty to Plaintiff and Class Members to properly and promptly notify them that their PII and PHI had been disclosed to and accessed by unauthorized third-party cybercriminals.

104.    Defendants knew or should have known the risks of collecting and storing Plaintiff's and Class Members' PII and PHI and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that have targeted companies that stored PII and PHI in recent years.

105.    Given the nature of Defendants' business, the sensitivity and value of the PII and PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

106.    Defendants breached these duties and the applicable standards of care by:

    a.    Failing to conduct proper and reasonable training and due diligence over vendors and employees and data security systems, practices, and procedures;

24

b.      Failing to conduct proper and reasonable due diligence over the employees, vendors, or contractors that were the vector(s) storing Plaintiff's and Class Members' PII and PHI;

c.      Failing to maintain reasonable and appropriate oversight and audits on their internal data security and their employees, vendors, or contractors that were the vectors of the cybercriminals' infiltration into the system(s) storing Plaintiff's and Class Members' PII and PHI;

d.      Failing to adequately separate and isolate PII and PHI from publicly accessible or publicly adjacent environments in their systems;

e.      Failing to implement and maintain reasonable safeguards and procedures to prevent the unauthorized disclosure of Plaintiff's and Class Members' PII and PHI;

f.      Failing to monitor and detect the confidential and sensitive data environment(s) storing Plaintiff's and Class Members' PII and PHI reasonably and appropriately in order to prevent or limit the Data Breach;

g.      Failing to implement and maintain reasonable data storage and retention procedures with respect to the PII and PHI to ensure the PII and PHI were being stored and maintained for legitimate and useful purposes;

h.      Failing to undertake reasonable and sufficient incident response measures to ensure that the unauthorized access detected on Defendants' internal network would not expose and cause disclosure and unauthorized acquisition of Plaintiff's and Class Members' PII and PHI;

i.      Failing to ensure that any and all unauthorized copies of accessed data, including Plaintiff's and Class Members' PII and PHI was deleted,

25

destroyed, rendered unable to be used, or returned to Plaintiff and the Class Members;

j.       Failing to reasonably conduct a forensic investigation into the scope, nature, and exposure of the Data Breach or to ascertain its full severity;

k.       Failing to provide full disclosure, deceptively misleading consumers and other individuals through false representations and misleading omissions of fact regarding the Data Breach, individuals' risk and exposure caused by the Data Breach, and the adequacy of the investigation of and response to the Data Breach; and

l.       Failing to provide accurate, complete, and sufficiently detailed notification to Plaintiff and the Class Members regarding the circumstances and extent of the Data Breach, its causes, its effects, the extent of the exposure of their PII and PHI, and details regarding the disposition of Plaintiff's and Class Members' PII and PHI at all times during the Data Breach.

107.   Defendants are both the actual and legal cause of Plaintiff's and the Class Members' harms and injuries. Had Defendants implemented and maintained adequate data security measures and provided timely notification of the Data Breach to affected consumers and other persons, including Plaintiff and Class Members, Plaintiff and Class Members would not have been damaged or would have been damaged to a lesser degree than they were.

108.   Plaintiff and Class Members could not protect their PII and PHI that was, or remains, in Defendants' possession.

109.   It was or should have been reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit

26

appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII and PHI to unauthorized individuals.

110.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised. The PII and PHI of Plaintiff and the Class were lost and accessed as a proximate result of Defendants' failure to exercise reasonable care in safeguarding, securing, and protecting such PII and PHI by, *inter alia*, not adopting, implementing, and maintaining appropriate security measures.

111.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII and PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII and PHI compromised as a result of the Data Breach; (vii) overpayment for the products and services that were received without adequate data security; and (viii) diminution of value of their PII and PHI.

## COUNT II
### Negligence *Per Se*

112.    Plaintiff incorporates paragraphs 1-98 as if fully set forth herein.

113.    Defendants had a duty to protect Plaintiff's and the Class Members' PII and PHI and breached those duties causing harm.  Those duties arise from, *inter alia*, the HIPAA Privacy

Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules"). Plaintiff and Class Members are the persons that the HIPAA Privacy and Security Rules were intended to protect and the harm that Plaintiff and Class Members suffered is the type of harm the rules were intended to guard against.

114.    Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII and PHI. Plaintiff and Class Members are the persons that Section 5 of the FTCA was intended to protect, and the harm that Plaintiff and Class Members suffered is the type of harm Section 5 of the FTCA intended to guard against.

115.    Defendants' violation of federal law, including HIPAA and FTC regulations, constitutes negligence *per se*.

116.    Plaintiff and the Class are within the class of persons that HIPAA and FTC regulations were intended to protect.

117.    The harm that occurred as a result of the Data Breach is the type of harm that HIPAA and the FTC regulations were intended to guard against.

118.    As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII and PHI are used; (iii) the compromise, publication, and/or theft of their PII and PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of

28

their PII and PHI for Plaintiff's and Class Members' respective lifetimes; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and other identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII and PHI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the current and former patients', customers' and other individuals' PII and PHI in their continued possession; (viii) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromise of PII and PHI as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class Members; and (ix) loss of privacy and potential embarrassment due to private medical information being known by third party actors.

119.    As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

120.    Additionally, as a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII and PHI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII and PHI in their continued possession.

121.    As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class are now at an increased risk of identity theft or fraud.

4871-6041-1746, v. 1

122.    As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

**COUNT III**
**Breach of Implied Contract**

123.    Plaintiff incorporates paragraphs 1-98 as if fully set forth herein.

124.    Defendants acquired and maintained the PII and PHI of Plaintiff and the Class, including names, birthdates, addresses, Social Security numbers, and information as a contractor and subcontractor to CMS.

125.    At the time Defendants acquired the PII and PHI of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendants would safeguard the PII and PHI and not take unjustified risks when storing the PII and PHI.

126.    Plaintiff and the Class would not have entrusted their PII and PHI to Defendants had they known that Defendants would not properly secure the PII and PHI, and not delete the PII and PHI that Defendants no longer had a reasonable need to maintain.

127.    Defendants further implicitly promised to comply with industry standards and to ensure that Plaintiff's and the Class Members' PII and PHI would remain protected.

128.    Implicit in the agreements between Plaintiff and the Class and Defendants to provide PII and PHI, was the latter's obligation to:

      a.    Use such PII and PHI for business purposes only;

      b.    Take reasonable steps to safeguard the PII and PHI;

      c.    Prevent unauthorized disclosures of the PII and PHI;

      d.    Provide Plaintiff and the Class with prompt and sufficient notice of any and all unauthorized disclosure or uses; and

30

e. Retain the PII and PHI only under conditions that kept such information secure and confidential.

129. In collecting and maintaining the PII and PHI of Plaintiff and the Class and publishing their privacy policies, Defendants entered into implied contracts with Plaintiff and the Class requiring Defendants to protect and keep secure the PII and PHI of Plaintiff and the Class. Plaintiff and the Class fully performed their obligations as required by Defendants. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and the Class are at an increased risk of identity theft or fraud.

130. Defendants breached the implied contract it made with Plaintiff and the Class by failing to protect and keep private the financial information of Plaintiff and the Class, including failing to:

a. Encrypt or tokenize the sensitive PII and PHI of Plaintiff and the Class;

b. Delete such PII and PHI that Defendants no longer had reason to maintain;

c. Eliminate the potential accessibility of the PII and PHI where such accessibility was not justified; and

d. Otherwise review and improve the security of the network system that contained such PII and PHI.

131. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer): ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; additional time spent scrutinizing bank statements, credit card statements, and

credit reports; expenses and/or time spent initiating fraud alerts, credit freezes; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

132.    As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and the Class are at an increased risk of identity theft or fraud.

133.    As a direct and proximate result of Defendants' breach of implied contracts, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

## COUNT IV
## Breach of Fiduciary Duty

134.    Plaintiff incorporates paragraphs 1-98 as if fully set forth herein.

135.    A relationship existed between Defendants and Plaintiff and the Class in which Plaintiff and the Class put their trust in Defendants to protect the PII and PHI of Plaintiff and the Class and Defendants accepted that trust.

136.    In light of the special relationship between Defendants and Plaintiff and Class Members, whereby Defendants became guardians of Plaintiff's and Class Members' PII and PHI, Defendants became a fiduciary by their undertaking and guardianship of the PII and PHI, to act primarily for Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' PII and PHI; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

137.    Defendants breached the fiduciary duties that they owed to Plaintiff and to the Class by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty.

4871-6041-1746, v. 1

138.   Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

139.   Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to encrypt or otherwise protect the integrity of the systems containing Plaintiff's and Class Members' PII and PHI.

140.   Defendants breached their fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach, by failing to protect the private information of Plaintiff and the Class, and by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

141.   Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII and PHI.

142.   Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and to the Class.

143.   But for Defendants' breach of fiduciary duty, the damage to Plaintiff and to the Class would not have occurred.

144.   Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and the Class.

145.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future

33

consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII and PHI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII and PHI in their continued possession; and (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

146.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

147.    As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

### COUNT VII
### Declaratory Judgment

148.    Plaintiff incorporates paragraphs 1-98 as if fully set forth herein.

149.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

150.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendants' data security measures

34

remain inadequate. Furthermore, Plaintiff continues to suffer injury due to the compromise of her

PII and PHI and remains at imminent risk that further compromises of her PII or PHI will occur in

the future.

151.    Pursuant to its authority under the Declaratory Judgment Act, this Court should

enter a judgment declaring, among other things, the following:

      a.     Defendants owe a legal duty to secure Plaintiff's, Class
Members', and all Medicare Beneficiaries PII and PHI and to
timely notify employees and consumers of a data breach under
the common law and Section 5 of the FTC Act;

      b.     Defendants have breached their duty to Plaintiff and the Class
by allowing the Data Breach to occur;

      c.     Defendants continue to breach this legal duty by failing to
employ reasonable measures to secure Plaintiff's, Class
Members', and all Medicare beneficiaries' PII and PHI. This
Court also should issue corresponding prospective injunctive
relief requiring Defendants to employ adequate security
protocols consistent with law and industry standards to protect
Plaintiff's, Class Members, and all Medicare beneficiaries' PII
and PHI; and

      d.     Defendants ongoing breaches of said duty continue to cause
harm to Plaintiff and the Class and potentially all Medicare
beneficiaries.

152.    If an injunction is not issued, Plaintiff will suffer irreparable injury and lack an

adequate legal remedy in the event of another data breach with Defendants. The risk of another

such breach is real, immediate, and substantial. If Defendants allow another data breach, Plaintiff

will not have an adequate remedy at law because many of the resulting injuries are not readily

quantified, and she will be forced to bring multiple lawsuits to rectify the same conduct.

153.    Plaintiff and the Class, therefore, seek a declaration that (1) each of Defendants'

existing security measures does not comply with their obligations and duties of care to provide

reasonable security procedures and practices appropriate to the nature of the information to protect

Medicare beneficiaries' PII and PHI, and (2) to comply with their duties of care, Defendants must

implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

d. Segmenting user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiff and Class Members for their respective lifetimes; and

h. Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their PII and PHI to third parties, as well as the steps they must take to protect themselves.

154. The Court should issue corresponding prospective injunctive relief requiring

Defendants to employ adequate security protocols consistent with the law and industry standards to

protect Plaintiff's, Class Members', and all Medicare beneficiaries' PII and PHI.

155. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to

Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft

and other damage. On the other hand, the cost to Defendants of complying with an injunction by

employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

156.     Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach with Defendants, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and all Medicare beneficiaries whose PII and PHI would be further compromised.

## VII.   PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, individually and on behalf of the Class, requests that the Court:

A.     Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as the Class representative, and appoint the undersigned counsel as Class counsel;

B.     Award equitable, injunctive, and declaratory relief as is necessary to protect the interests of Plaintiff and the Class. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

C.     Award damages to Plaintiff and the Class in an amount to be determined at trial;

D.     Award Plaintiff and Class Members their reasonable litigation expenses and attorneys' fees to the extent allowed by law;

E.     Award Plaintiff and Class Members pre- and post-judgment interest, to the extent allowable; and

F.     Award such other and further relief as equity and justice may require.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

37

Dated: May 8, 2023                        Respectfully submitted,

*/s/ James P. Ulwick*
James P. Ulwick (Federal Bar No. 00536)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410 752-6030
julwick@kg-law.com

*/s/ James J. Pizzirusso*
James J. Pizzirusso
(D. Md. Bar No. 20817)
HAUSFELD LLP
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
(202) 540-7200
jpizzirusso@hausfeld.com

Steven M. Nathan
(D. Md. Bar No. 30618)
HAUSFELD LLP
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com

Amanda V. Boltax*
Oregon Bar No. 225646
HAUSFELD LLP
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
(202) 540-7200
mboltax@hausfeld.com

Brian M. Knowles, Esquire*
SC Bar: 73108
Fed. I.D.: 9694
KNOWLES LAW FIRM, PC
768 St. Andrews Blvd., Charleston, SC 29407
T: (843) 810-7596 | F: (877) 408-1078
brian@knowlesinternational.com
www.knowlesinternational.com

38

Robert M. Turkewitz, Esquire*
SC Bar: 011589
Fed. I.D.: 4902
LAW OFFICE OF ROBERT M. TURKEWITZ, LLC
768 St. Andrews Blvd.
Charleston, South Carolina 29407
Ph. 843-628-7868
Fax 843-277-1438
Email: rob@rmtlegal.com

*Counsel for Plaintiff Barbara Reynolds Burger,
individually and on behalf of all others similarly situated.*

*  pro hac vice forthcoming*

4871-6041-1746, v. 1